Goss *v.* Kurn *et al.*

(Division B. Feb. 5, 1940.)

[193 So. 783. No. 34028.]

**Adams & Long**, of Tupelo, for appellant.

C. R. Bolton, of Tupelo, D. W. Houston, Sr. and Jr., of Aberdeen, and J. W. Jamison, of St. Louis, Mo., for appellees.

Argued orally by **S. H. Long**, for appellant, and by **C. R. Bolton**, for appellees.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellant was plaintiff in the court below. He brought suit against J. M. Kurn and John G. Lonsdale, trustees of the St. Louis-San Francisco Railway Company, for personal injuries sustained, as he contended, by strain from being required to lift rails, he having been previously injured, and the railroad company and the trustees aforesaid had knowledge of the prior injury and his inability to do heavy work, lifting, et cetera; and that, as a result, he sustained a permanent physical injury, for which he has asked damages in the sum of $3,000.

A principal question in the case is whether at the time of the injury sued for the work of the appellant was in interstate or intrastate transportation. If he had been engaged in interstate transportation, federal liability under the Carriers Law would control, and he would have been held to have assumed the risk of his employment. The circuit judge, at the conclusion of the plaintiff's evidence, held that the Federal Employers' Liability Act, 45 U. S. C. A. Sections 51-59, controlled, and that he had assumed the risk, that the company or trustees were not liable, and granted a peremptory instruction in favor of the defendants, appellees here.

The type of work which the appellant was doing at the time the injury occurred is described in his testimony in the record, as follows:

"Q. Now, what work were you doing when you were injured? A. Loading rails.

"Q. I want you to tell the jury there why you were loading rails. A. Well, that job was allowed three men on the road.

"Q. You mean section hands on the road? A. Three section hands, and one of them laid off, that didn't leave but two, and they had some rail to load, and it was a lot of scrap rail, as then they had some second hand rail, they called it, and Mr. Maxwell come and told me he wanted me to help load the rail, and I told him it was too heavy for me to load, I says 'That would hurt me, I never would get over it' and he says 'You have to do what I say do if you expect to stay here' and I says 'If I have to do it, I want my job. I will do the best I can.'

"Q. Explain to the jury how you were handling those rails? A. They had them unloaded just this side of my house on the ground. Took a push car and loaded the rail on the push car and come on out on the main line and in on another sidetrack right up behind the flat car, roll the push car up by the track the flat car was on and lift that rail up on the flat car, I guess you know what I am talking about, one like you load logs on.

"Q. You mean the flat car was on the same track the push car was on? A. Same track, and lift that rail on the end of the flat car off the push car and after we get it there we get up, two of us, Mr. Maxwell and the other boy was pushing it and we was up and pulling it.

"Q. They were pushing it from the back end? A. Yes, sir, and this little rail wasn't any trouble at all.

"Q. What you mean by that? A. Some smaller, eighty or ninety, it's light besides that hundred and twelve.

"Q. Did you load the little rails before you loaded the big rails? A. Yes, sir.

"Q. How many big rails did you have there? A. Two.

"Q. What kind of rails were they, were they new rails or secondhand? A. They was new rails but defective, they had been run in the main line and had some bad places in them, they was taken out.

"Q. You say two of them, what weight were they? Do you know what they weighed? A. I couldn't tell you what the rail weighed but I can tell you how long the rail was and what size.

"Q. How long? A. Thirty-nine feet long and a hundred twelve pounds to the yard, I can't figure it.

"Q. I believe you stated a while ago that you and one of the other hands got up on the flat car to pull the rail up on it? A. Yes, sir.

"Q. Was this forman, Mr. Maxwell, there directing this work? A. Yes, sir.

"Q. Telling you what to do and how to do? A. Yes, sir.

"Q. Now, I want you to tell the jury in what part of that operation or that lifting there it was you got hurt. A. Lifting it and pulling it back on the car was what hurt me.

"Q. What rail was it? A. That big 12-pound rail.

"Q. What did you do when you got hurt there? A. When I got hurt I went out by the side of the house and laid down until I could go to the doctor."

The appellant also testified that after he was injured in 1935, he was assigned to employment of a light character, and because the company was aware of his inability to further do heavy work, they had instructed the section foreman not to assign him to heavy work as he had been injured and had not sued the company. At the time of his injury, in 1935, he carried liability insurance and collected under the policy, furnishing the necessary proof of his injury by a physician; but, he was required to sign an instrument to the trustees of the railroad reciting, among other things, that he was not injured and had no claim against the company, et cetera, which was required to be retained in the employment of the company as they would not continue in their employment anyone who had an unsettled claim against them.

It appears in the evidence that the appellant had been in the employment of the railway company from 1917

until 1937, at which time he was discharged upon presenting this claim; that he was first injured in 1922 or 1923 but was continued in their employment after recovering therefrom; that he was again injured in 1935, and, as stated above, he was assigned to light work until, as plaintiff testified, under the direction of the section foreman and under plaintiff's protest he was required to lift steel rails—he was told by the section foreman that he could not remain on the job if he did not do what he was told to do, and as a result the injury was sustained.

We have examined the evidence and we think that the employment was not in interstate transportation or work so closely related thereto as to be a part thereof. See New York Cent. R. Co. v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629; Industrial Accident Commission of the State of California v. Davis, 259 U. S. 182, 42 S. Ct. 489, 66 L. Ed. 888; Chicago & Northwestern R. Co. v. Bolle, 284 U. S. 74, 52 S. Ct. 59, 76 L. Ed. 173; New York, New Haven & Hartford R. Co. v. Bezue, 284 U. S. 415, 52 S. Ct. 205, 76 L. Ed. 370, 77 A. L. R. 1370. It seems to be the rule that if the pleadings are silent as to the character of employment, whether in interstate or intrastate, that the presumption is that the employment was within the State and that the employee was engaged in intrastate commerce. Roberts, Federal Liabilities of Carriers, vol. 2, page 1960, Section 1017, which reads as follows: "Until the contrary is shown, it will be presumed in an action for injuries to a railroad employee through the negligence of his employer, in the use or operation of its railway within the State, that he was engaged in intrastate commerce and that he is seeking a remedy under the laws of the State. However, as is seen hereafter, the presumption does not obtain where evidence is introduced at the trial of an element of interstate commerce in the employment in connection with which the cause of action arose."

. To bring the action within the federal liability under the federal law, the pleading should state a case coming

under such federal liability, but if the plaintiff alleges liability under a state law, the burden is upon him to sustain the allegations of the declaration. 2nd Roberts Federal Liabilities of Carriers, Section 1018.

We think that the appellee is in error therefore in saying that the same result must be reached whether the case is under the state law or under the federal law. The testimony of plaintiff, if true, would show negligence on the part of the master under the state law, and he would not be expected to assume or held to have assumed the risk of the master's negligence; and, under state law, the direction of the section foreman to do the work in which the injury occurred in which he told him he would lose his job if he did not do what he was told to do, relieved him from any assumption of the risk.

The peremptory instruction was given at the conclusion of the plaintiff's evidence, and the evidence on behalf of the defendants was not presented to the court or jury. Consequently, the case must be reversed and the cause remanded for a new trial.

Reversed and remanded.